## GILA WATER CO. et al. v. WITBECK.

Circuit Court of Appeals, Ninth Circuit.
November 12, 1928.

No. 5571.

Joseph L. B. Alexander, William L. Barnum, Alexander B. Baker, and Louis B. Whitney, all of Phœnix, Ariz., for appellants.

Kibbey, Bennett, Gust, Smith & Lyman, of Phœnix, Ariz., for appellee.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. This is an appeal from an order appointing, with broad powers, a receiver for the Gila Water Company. The company is the owner of more than 75,000 acres of land in Arizona and of a canal system headed by a dam in the Gila river, constructed to supply water for the irrigation of the land. The plaintiff,

Ruth Witbeck, is the holder of a small amount, 125 shares, of its capital stock, and in her complaint she alleges that she brings the action not only in her own behalf but upon the behalf of Arthur Ainsworth, Frank Ainsworth, and Sylvia Craig, who are her brothers and sister and each of whom also holds 125 shares. Plaintiff sues in her capacity as stockholder and not otherwise, and the burden of her complaint is mismanagement of the Gila Company's affairs by its codefendant Frank A. Gillespie who, since 1919, has been in control thereof as a majority stockholder. From as far back, at least, as 1901 down to 1919, C. F. Ainsworth, plaintiff's father, and his immediate family held all of the stock of the company. The project was incomplete, and apparently for some time the enterprise had been dormant, when in 1919 Gillespie came into it under the circumstances briefly explained in our decision in No. 5557, Murphy et al. v. Craig (filed November 5, 1928) 28 F.(2d) 963. Under the arrangement therein referred to, Gillespie was to provide, in addition to the $300,000 paid to Murphy, $700,000 to be used for the purpose of development, and in return was to have a large majority of the capital stock. Pursuant to the terms of the contract, the Ainsworth directors resigned, and Gillespie and his nominees were elected; Ainsworth himself, however, remaining on the board. Gillespie became president and Ainsworth was made vice president. The latter, who is an attorney at law, also became counsel for the company and continued to be a director, the vice president, and counsel up until the early part of 1926. This fact is adverted to for the reason that the record leaves no escape from the view that the suit is essentially a controversy between members of the two families, headed and directed upon the one side by C. F. Ainsworth and on the other by the defendant Gillespie. No creditor is complaining, and no one of the few individual water users presents any grievance.

The complaint was filed June 4, 1926, not long after Ainsworth resigned as an officer of the company. In so far as concerns grievances for which a court may grant relief, the averments are general and vague to a high degree. There are specific prayers for injunction and a receivership and that an auditor be appointed to audit the company's books and accounts—all remedies of an intermediate or provisional character, to which the court can resort only in case they are ancillary to ultimate relief which may be the subject of a final decree. There is a further prayer that the true indebtedness of the company be determined; but, with the exception of Frank A. Gillespie, no one claiming to be a creditor is made a party. For example, the mortgagee of a mortgage of record upon which there is apparently due half a million dollars is not named as a defendant, though apparently it is plaintiff's contention that the claim is in whole or in part invalid. There is also a prayer, based upon a vague and almost incomprehensible allegation of the pleading, that the transfer to the company of certain water rights be canceled, and a like prayer respecting the "attempted purchase" by the company of some lands from the state of Arizona, though neither the state of Arizona nor the persons who transferred the water rights are made parties. And finally plaintiff prays that upon a determination of the company's outstanding indebtedness the court, through a receiver, sell sufficient of the company's property to discharge the same. In short, without the presence of other parties no relief of a permanent or final character could be granted, unless it be injunctive relief against a sale of the entire holdings of the company, which it is alleged Gillespie was planning or intending to make at the time the suit was filed. The averments upon this subject are so general and vague that it is to be doubted whether they state a cause of action.

Apparently the suit was commenced for the purpose primarily of enjoining the execution of this alleged project of sale. Accordingly, upon no showing other than that made by the bill, upon the day after the suit was commenced plaintiff secured an order requiring the defendants to appear and show cause why an injunction should not be issued, and in the meantime restraining them from proceeding with the sale. Upon June 30, 1926, the date to which the hearing upon the order to show cause was continued, the court, upon consideration of the complaint and an affidavit made by C. F. Ainsworth, ordered the issuance of an injunction pendente lite as prayed, restraining the sale of any part of the company's property. This injunction remained in force until June 16, 1927, when it was dissolved upon plaintiff's own motion. Substantially nothing further was done until February 6, 1928, when plaintiff made a motion for the appointment of a receiver based upon the complaint and the injunction affidavit filed nearly two years prior thereto, and an affidavit of one Bennit in which, as one of the

grounds for such appointment, the affiant stated that Gillespie had made no attempt to dispose of the lands of the company or provision to pay its indebtedness. Just how Gillespie could sell land or raise money on the property of the company during the 12 months he was under injunction the affiant did not suggest. But the affidavit is of little present importance, for upon the return to the order to show cause both sides filed voluminous affidavits of a highly conflicting character, and the oral evidence of numerous witnesses was heard, which took a wide range. Among the affidavits is one by Gillespie purporting to give a full history with explanations of many transactions, and charging to C. F. Ainsworth responsibility and assent in respect to what had been done; and one of like length of Ainsworth equally personal and uncomplimentary respecting Gillespie. Neither plaintiff nor her sister or brothers appeared by affidavit or to give their testimony. The court filed no finding or opinion, but at the conclusion of the hearing orally announced the appointment of a receiver without assigning reasons other than possibly that he believed the company to be insolvent. But insolvency of a corporation would not ordinarily constitute independent ground for the appointment of a receiver at the instance of a stockholder, if by insolvency is meant bankruptcy, for the very obvious reason that upon that hypothesis the stockholder is without substantial interest.

Here counsel for plaintiff are seemingly unwilling to declare their position upon that issue. They urge the contention that Gillespie, being in full control, has mismanaged and is likely to continue to mismanage the business of the company, first, in that he has not caused the canals to be kept cleaned out—not that such failure has resulted in any real peril to the system, but that as a result its carrying capacity is impaired. Gillespie replies that funds have not been available for the purpose, and further that the expenditure has not been necessary, for the reason that, silted though they are, the canals have adequate capacity for all the lands under cultivation and in excess of the water available during the larger part of the irrigation season. Under the circumstances, we find no basis in this feature of the case for a receivership. In the second place, the charge of mismanagement is predicated upon the fact that out of approximately 80,000 acres owned by the company, not to exceed 18,000 have been brought under cultivation. In the absence of explanation, the point would doubtless present a most serious aspect. Ordinarily to let land with an expensive water right lie idle would be highly improvident, for to a loss measured by interest on the heavy investment must be added current maintenance and tax charges, generally no light burden. But as counter considerations here it is to be observed that the period covered by plaintiff's criticism has been one of extraordinary agricultural depression, during which farming generally has not been highly profitable. And to clear, level, and ditch, and bring to productivity, raw desert land is an expensive operation requiring a substantial investment of new capital. The company did not have such capital, and it is seriously doubted whether it could have been borrowed upon any security it was in a position to offer, unless the stockholders themselves would furnish it. There is no suggestion in the record that plaintiff or the other minority stockholders were either able or willing to provide such funds. So far as appears, no one of them contributed a dollar to the enterprise after Gillespie came into it. He held 78 per cent. of the stock and to begin with had put in a million dollars as required by his agreement. Owing to unexpected contingencies and vicissitudes, to protect his initial investment he had from time to time made loans and advances to the company, with the knowledge and encouragement of Ainsworth, which according to his claim aggregate approximately two million more. True, in a general way the amount of his valid claims is questioned by the plaintiff, but when it is noted that mortgages were given to him and his assigns for that amount under authorization of the board of directors while Ainsworth was a member thereof and was vice president, the validity of the claims must be assumed until the contrary is shown, and it is not seriously contended that a finding of invalidity would be warranted upon the evidence as we have it. Certain it is that no minority stockholder could demand that Gillespie make further advances to the corporation, and under all the circumstances we are clearly of the opinion that while intelligent men might differ touching the course actually pursued respecting the reclamation of the land, a finding of bad faith on his part or gross negligence or incompetence would be unwarranted; and without one or the other of these elements imprudent management would furnish insufficient basis for a receivership.

The same considerations apply to the general subject of refinancing the project or making a sale of it in its entirety, to which much of the evidence was directed. Whether Gillespie did or did not use the best judgment in some of his unsuccessful plans and efforts, or in failing to yield to proposals coming from the Ainsworths and others, it cannot be said that he acted in bad faith or without basis of reason.

It may be that the books of the company should be thoroughly audited. But if the minority stockholders want such audit they may have it made. There is no contention that access to the books has been denied, and in case of such denial the courts would undoubtedly give relief. The allegations in the bill upon the subject of a demand that the company have the audit made and its refusal are so general and meager as to suggest that the contention is intended as a mere gesture. Plaintiff did not see fit to come into court and disclose by her testimony what real efforts, if any, she had ever made to procure such audit.

With reference to overhead expenses, more rigid economy could not be exercised. Neither Gillespie nor any other one of the directors has ever been paid anything for service and the few employés receive very moderate compensations.

We not only think the record furnishes no just basis for a receivership, but we are wholly at a loss to perceive what possible good could be accomplished by it. The need of the enterprise is more money, and it is manifest, we think, that the only way new capital can be procured is by a comprehensive scheme of reorganization. This the court cannot undertake. From the scope of the order and the general conditions which admittedly exist, it would seem to be a necessary inference that the purpose of the receivership is either to liquidate the assets of the company and distribute the same to creditors and stockholders or to run its business indefinitely for the purpose of restoring solvency. Neither course is permissible. Except for the purpose of preserving the property, the court cannot incur financial obligations to the displacement or prejudice of the mortgage lien, and it would require courage to suggest that third persons will loan to a receiver money upon the security only of such equity, if any, as may remain after satisfying the mortgages, even though upon final hearing it may be held that the amount thereof is something less than Gillespie claims. To the suggestion that the receiver sell tracts of land with water rights, the answer is that without the consent of the mortgagees he cannot sell free from the mortgage liens, and it would hardly be contended that any one would knowingly purchase subject to the mortgages.

As against invalid claims under the mortgages, the minority stockholders may have adequate protection. By intervention in any suit brought to foreclose they may challenge the validity or the amount thereof. True in case of a decree of foreclosure the company's property may be sold for less than it might bring at private sale. But it is not the function of a receivership indefinitely to stay the hand of a secured creditor in the enforcement of his lien by lawful means. And the court in which a foreclosure is had may by fixing an upset price or other expedient protect the debtor and its minority stockholders against undue sacrifice.

The primary purpose of the suit having been accomplished by the injunctive order, we are clearly of the opinion that the appointment of a receiver was improvident, and that the continuance of the receivership can result in no legitimate good to the minority stockholders and will necessarily result in harassment to Gillespie, who, in view of the magnitude of his interest as a stockholder and creditor, should have control so long as he acts in good faith and exercises reasonable judgment in managing the corporation's business and furthering its interests. It is to be assumed that he made his heavy investment upon the condition and in consideration that he have control. To such a condition the Ainsworths, who theretofore had control, assented, and even if it were conceded that their judgment as to what now should be done is better than his, the concession would not warrant the maintenance of a receivership unless, as already stated, he acts in bad faith or his management is characterized by recklessness or gross incompetence.

The order is reversed.